UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**DANIELLE SEELMAN-FLIKE,**

                **Plaintiff,**

                    v.

**TURBINE ENGINE
COMPONENTS
TECHNOLOGIES - UTICA
CORPORATION,**

                **Defendant.**
_____

**6:20-cv-1062
(GLS/TWD)**

## SUMMARY ORDER

Plaintiff Danielle Seelman-Flike commenced this action against defendant Turbine Engine Components Technologies - Utica Corporation[1] (TECTU) alleging discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964[2] and New York State Human Rights Law[3] (NYSHRL).  (Compl., Dkt. No. 1.)  Now pending is TECTU's motion for summary judgment.  (Dkt. No. 47.)  For the reasons that follow, the motion is granted.

---

[1] Seelman-Flike also brought claims against Turbine Engine Components Technologies Corporation, but these claims were dismissed by stipulation of the parties.  (Dkt. No. 39.)

[2] *See* 42 U.S.C. §§ 2000e-2000e-17.

[3] *See* N.Y. Exec. Law §§ 290-301.

Seelman-Flike worked at TECTU from September 2019 until December 2019. (Def.'s Statement of Material Facts (SMF) ¶¶ 2-3, Dkt. No. 47, Attach. 2.)[4] At the time of her termination, Seelman-Flike was a "probationary employee" of TECTU and was subject to termination "with or without cause." (*Id.* ¶ 9.)

On December 3, 2019, Seelman-Flike met with TECTU's Senior Human Resources Manager, Donna Prentice, and told Prentice that she was pregnant. (*Id.* ¶¶ 6, 11-12.) At her deposition, Seelman-Flike testified that Prentice was excited for her, and described the meeting as positive and encouraging. (*Id.* ¶ 12.) Following the meeting, Seelman-Flike approached her shift supervisor, Ben Schiros, and informed him that she was pregnant. (*Id.* ¶ 16.) Schiros responded first by congratulating her. (*Id.* ¶ 19.) He then stated that "he wasn't sure if [Seelman-Flike] could continue to work [at TECTU]" because her employment required "a lot of movement and heavy lifting." (*Id.* ¶ 20.)[5] Schiros' comment upset Seelman-Flike and made her cry. (*Id.* ¶¶ 24-25.) At some point after this

---

[4] Unless noted otherwise, the facts are undisputed.

[5] Seelman-Flike disputes this paragraph of TECTU's statement of material facts, but provides a nearly identical rendition of this conversation. (*Compare* Def.'s SMF ¶ 20, *with* Pl.'s SMF ¶ 20.)

2

interaction, Seelman-Flike told another shift supervisor, Dan Revette, about her interaction with Schiros. (*Id.* ¶ 26.) Revette responded by stating that "[t]here is no issue that you are pregnant" and told her that she could continue to work "until [her] doctor says [she] need[s] to go on leave," and that she could return to work after her leave. (*Id.* ¶ 27.) The sentiment of Revette's statement was reiterated by both Prentice and TECTU's Operations Manager, William Brown. (*Id.* ¶¶ 8, 29.) At this time, Seelman-Flike stated that she "felt very secure with [her] job" and did not believe she would be terminated due to her pregnancy. (*Id.* ¶ 30.)

During her employment at TECTU, when supervisors or coworkers instructed Seelman-Flike to perform a task, she would respond with "no," "[n]o, thank you," or a similar comment. (*Id.* ¶¶ 40-41.) In one such instance, one of Seelman-Flike's supervisors, Jim McDonough, gave Seelman-Flike an assignment, to which she replied "no." (*Id.* ¶¶ 10, 42.) She also engaged in similar conduct with another one of her supervisors, Bryan Trevett. (*Id.* ¶¶ 14, 42.) Seelman-Flike admits to making such statements, but contends that they were made in jest, and that she always performed the tasks she was instructed to carry out. (*Id.* ¶ 40.) However, Seelman-Flike's supervisors found this behavior disrespectful and irritating,

3

especially when it took place in the presence of other employees, and her coworkers believed her responses were serious.  (*Id.* ¶¶ 45-46, 49.)[6]

While working in TECTU's "CMM room," on more than one occasion, Seelman-Flike was observed watching Netflix on her phone by Trevett, one of Seelman-Flike's supervisors, along with another coworker, Bobby Buttenschon.  (*Id.* ¶¶ 14, 75, 77, 104.)

Due to Seelman-Flike's "insubordinat[ion]," Trevett determined that she should be terminated, and expressed this opinion to Prentice on December 11, 2019.  (*Id.* ¶¶ 102, 105-06.)  Prentice then consulted with Trevett about his recommendation, and credited his concerns about Seelman-Flike.  (*Id.* ¶¶ 111-13.)  The week prior, Prentice was also informed by McDonough of the exchange he had with Seelman-Flike, when he requested that she perform a task and she replied "no."  (*Id.* ¶¶ 10, 114.)  Prentice also spoke with Buttenschon, who told her that he had observed Seelman-Flike "watching her phone" in the "CMM room."  (*Id.* ¶

---

[6]  Seelman-Flike disputes these paragraphs in TECTU's statement of material facts, citing to her own testimony stating that she was never *told* by her supervisors that they perceived her comments this way, and that she never explicitly stated that she was being serious when making these statements.  (Pl.'s SMF ¶¶ 45-46, 49.)  However, because her testimony does not directly dispute the facts offered by TECTU—that her supervisors found her behavior disrespectful and irritating, and that her coworkers believed her responses to assignment requests to be serious—these facts are deemed admitted.

4

115.)  After speaking with Trevett, McDonough, and Buttenschon, Prentice terminated Seelman-Flike's employment.  (*Id.* ¶¶ 112, 115, 117-18.)

Sometime after her termination, Seelman-Flike's coworker, Jake Mahl, sent her a text message, telling her to "talk to [Prentice] . . . and tell her you feel like you were singled out because of [your pregnancy].  It's not like you didn't do what they asked."  (Dkt. No. 53, Attach. 6 at 27.)  TECTU contends that Mahl made this statement simply "to 'console,' and be 'supportive' of, Seelman-Flike" and that Mahl truly believed that Seelman-Flike was "insubordinate and that she '[g]ot what she deserved' when TECT[U] terminated her employment."  (Def.'s SMF ¶¶ 125-26.)

The standard of review under Fed. R. Civ. P. 56 is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

Defendants seek summary judgment on Seelman-Flike's claims because she cannot demonstrate that TECTU's proffered non-retaliatory and non-discriminatory reasons for firing her were pretext.  (Dkt. No. 47, Attach. 1 at 13-20.)  Seelman-Flike contends that TECTU has not

5

established a legitimate reason for firing her because they have not offered "meaningful contemporaneous documentary evidence" supporting their position, and, instead, rely on "self-serving declarations . . . drafted by attorneys and created over a year after the events at issue occurred." (Dkt. No. 52 at 8.) In the alternative, she argues that TECTU's proffered reasons for her termination are pretextual. (*Id.* at 11-21, 23-26.)

Retaliation and discrimination claims under both Title VII and NYSHRL are analyzed under the *McDonnell Douglas* burden shifting framework. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2015); *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 328 (S.D.N.Y. 2020); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To make out a prima facie case for retaliation a plaintiff must demonstrate "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015) (citation omitted). To make out a prima facie case for discrimination a plaintiff must show that "(1) [she] was within the protected

6

class; (2) [she] was qualified for the position; (3) [she] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (internal quotation marks omitted).

Once a prima facie case of retaliation or discrimination is established, the burden shifts to the employer to demonstrate that a legitimate, non-retaliatory or non-discriminatory reason existed for its action. *See Littlejohn*, 795 F.3d at 307; *Menaker*, 935 F.3d at 30.

If the employer meets its burden, plaintiff must demonstrate that the employer's proffered rationale is pretextual. *See Cox v. Onondaga Cty. Sheriff's Dept.*, 760 F.3d 139, 145 (2d Cir. 2014). "To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citations omitted). With respect to a retaliation claim, a plaintiff must show that retaliation was the "but-for" cause of her adverse

7

employment action, and may do so "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non[-]retaliatory reasons for its action" such that "a reasonable juror could conclude that the explanations were a pretext for a prohibited reason*." Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Assuming without deciding that Seelman-Flike can establish a prima facie case, TECTU has provided a non-retaliatory and non-discriminatory reason for Seelman-Flike's termination. (Def.'s SMF ¶¶ 102, 105-06, 111-15,117-18 (demonstrating that Seelman-Flike was terminated due to her insubordination and for being on her phone during her shifts).)[7]

---

[7] While Seelman-Flike argues that TECTU has "failed to meet its burden of production" because they have not offered "meaningful contemporaneous documentary evidence" and only provides "various self-serving declarations . . . drafted by attorneys and created over a year after the events at issue occurred," also containing inadmissible hearsay, inconsistencies, and "bias," (Dkt. No. 52 at 8), the court is not persuaded by this argument. The declarations submitted by TECTU are not self-serving. *See United Magazine Co. v. Murdoch Magazines Distribution*, Inc., 393 F. Supp. 2d 199, 211 (S.D.N.Y. 2005) ("As the Supreme Court has held, a self-serving [declaration] . . . merely reiterates conclusory allegations in [declaration] form." (citation omitted)). Further, the timing of the declarations submitted by TECTU, along with the fact that they were drafted by counsel does not have any bearing on their compliance with Federal Rule of Civil Procedure 56(c)(4) ("A[] . . . declaration used to support . . . a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."). Additionally, while Seelman-Flike does not provide specific examples of the statements in any of the declarations that she contends are hearsay, the court is not convinced that any statements in the declarations constitute hearsay, as they are presumably not offered for the truth of the matter asserted, but, rather, the effect on the listener. For example, in Prentice's declaration she states that "I spoke with . . . Buttenschon, who told me he had seen Seelman-Flike watching her phone in the CMM room." (Dkt. No. 47, Attach. 3 ¶ 15.) While this

8

Seelman-Flike has not, however, demonstrated that the legitimate, non-retaliatory/-discriminatory reasons are pretextual.  While Seelman-Flike attacks the veracity of TECTU's proffered explanation, in part by offering justifications for her behavior, the court is not persuaded.  Seelman-Flike argues that the reason she was not performing her assigned task in the "CMM room" was because she did not have the proper personal protective equipment.  (Dkt. No. 52 at 13-18, 24-25).  She further asserts that when she would reply "no" to requests from her supervisors that she was joking and would "always complete[] the task assigned to her."  (*Id.* at 9, 25.)  Even if these justifications are true, Seelman-Flike does not dispute that Trevett recommended her termination to Prentice due to her "insubordinat[ion]."  (Def.'s SMF ¶¶ 102, 105-06.)  Nor does Seelman-Flike dispute that Prentice credited both Trevett and McDonough's concerns about her, as well as what Buttenschon told her about observing Seelman-Flike "watching her phone" in the "CMM room."  (*Id.* ¶¶ 111-15.)

---

may constitute hearsay if it was offered for the truth of the matter asserted, it is presumably offered to show that Prentice believed that Seelman-Flike's termination was necessary due to her behavior during her shift.  Further, any "bias" or meaningful inconsistencies in the declarations submitted by TECTU are not apparent to the court.  Finally, contrary to Seelman-Flike's contention, TECTU has provided "contemporaneous documentary evidence."  (*See e.g.*, Dkt. No. 47, Attach. 10 at 10 (email from McDonough to Trevett detailing Seelman-Flike's recent insubordination).

9

Further, Seelman-Flike's argument does not address the fact that, after speaking with Trevett, McDonough, and Buttenschon, Prentice terminated Seelman-Flike's employment based on their concerns with her as an employee.  (*Id.* ¶¶ 112, 115,117-18.)  Seelman-Flike has not provided any evidence that Prentice terminated her employment for any reason other than the information provided to her by Trevett, McDonough, and Buttenschon, and, thus, has failed to demonstrate pretext.  *See Joy v. Kinplex Corp.*, No. 06 Civ.1990, 2008 WL 1995370, at *7 (E.D.N.Y. May 6, 2008) ("The [c]ourt recognizes that the fact that an employee disagrees with an employer's reasons for termination, or even has evidence that the decision was objectively incorrect, does not demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."); *see also Pacenza v. IBM Corp.*, No. 04 Civ. 5831, 2009 WL 890060, at *14 (S.D.N.Y. April 2, 2009) ("[I]n order to avoid a finding of pretext, an employer must merely have a good faith belief in the articulated reason for an employee's termination." (citation omitted)).

Additionally, to the extent Seelman-Flike points to the comments made by Schiros and Mahl as evidence of pretext, (Dkt. No. 52 at 5-7, 20, 23), this argument is equally unpersuasive.  While the court is not

convinced a reasonable jury could interpret Schiros or Mahl's comments as evidencing a discriminatory or retaliatory animus, regardless, it is undisputed that neither had any role in Seelman-Flike's termination, and none of the individuals involved in her termination made any similar statements.  (Def.'s SMF ¶¶ 27, 29, 133.)[8]  Because Seelman-Flike has failed to demonstrate that the reason for her termination provided by TECTU is pretext, TECTU's motion must be granted.[9]

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that TECTU's motion for summary judgment (Dkt. No. 47) is **GRANTED**; and it is further

**ORDERED** that Seelman-Flike's complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

---

[8] Seelman-Flike disputes portions of paragraph 133 of TECTU's statement of material facts, but she does not dispute the fact that Shiros "made no recommendation to Trevett or Prentice" regarding Seelman-Flike's termination.  (Def.'s SMF ¶ 133; Pl.'s SMF ¶ 133.)

[9] For this reason the court need not address TECTU's argument regarding damages. (Dkt No. 47, Attach. 1 at 21-22.)

11

**IT IS SO ORDERED.**

September 14, 2022
Albany, New York

*Gary L. Sharpe*
Gary D. Sharpe
U.S. District Judge